IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ONIE JANE PENA, Individually and as Representative of the Estate of GEORGE CORNELL, Deceased,<br><br>*Plaintiff,*<br><br>v.<br><br>DALLAS COUNTY HOSPITAL DISTRICT d/b/a PARKLAND HEALTH AND HOSPITAL SYSTEM; UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER AT DALLAS; and KEVIN T. BROWN, M.D., SHAWN CHAMBERS, M.D., ANN M. MOLINARO, SHERWIN DE GUZMAN, JOHNNY ROBERTS, RONALD GIVENS, ALEXANDER ACHEBE, JOHN QUINN, M.D., NANCY SCHIERDING, VERNELL BROWN, RONNIE JOE ANDERSON, M.D., JOHN JAY SHANNON, M.D. and JOHN GREGORY FITZ, M.D. all in their Individual and Official Capacities,<br><br>*Defendants.* | CIVIL ACTION NO. 3:12-CV-00439-N |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff Onie Jane Pena, Individually and as Representative of the Estate of George

Cornell, Deceased, files this First Amended Complaint[1] and asserts the following allegations and

claims against Defendants Dallas County Hospital District d/b/a Parkland Health and Hospital

---

[1] This First Amended Complaint is being filed pursuant to the Court's September 4, 2012 Order to replead (Docket #31) and extension to that deadline (Docket #33).

System ("Parkland"), University of Texas Southwestern Medical Center at Dallas ("UTSW"),
Kevin T. Brown, M.D., Shawn Chambers, M.D., Ann M. Molinaro, Sherwin de Guzman, Johnny
Roberts, Ronald Givens, Alexander Achebe, John Quinn, M.D., Nancy Schierding, Vernell
Brown, Ronnie Joe Anderson, M.D., John Jay Shannon, M.D. and John Gregory Fitz, M.D. and
prays for her damages as follows:

## I.
### INTRODUCTION

1.     This is a case about two of Dallas' primary health care institutions who have
forgotten that at their core the well-being of patients should come first.  These two institutions
have abandoned that simple bedrock principle of medical ethics embodied in the maxim *primum
non nocere* – first, do no harm.  Parkland's and UTSW's primary focus is not on the well-being
of patients.  Instead, they have together turned a hospital of first and only resort for so many
Dallas citizens into a place where newly-minted doctors (and even non-medical personnel) are
permitted to treat (or completely fail to treat) patients without being appropriately trained and
supervised by licensed, qualified medical personnel.  These two institutions turn a blind eye to
the devastating but entirely foreseeable tragic consequences of their unacceptable practices on
the poor and uninsured who are so dependent on them.

2.     UTSW is a medical school that employs faculty physicians to teach in classrooms
and perform medical services in UTSW-owned hospitals.  Parkland is a county hospital that has
a service agreement with UTSW in which UTSW faculty and students also provide services at
Parkland.  Unfortunately, this arrangement has lead to a two-tiered system: at the UTSW

facilities, private-paying patients are treated by fully trained faculty physicians and supervised or observing students; at Parkland, poor, charity or governmental-paying patients get substandard care, do not get the attention of UTSW faculty, and instead, at best, get unsupervised students and undertrained health care staff treating them. At its simplest, those with money get quality and qualified care; those who are poor or are on government assistance get treatment from less qualified or unqualified practitioners or, as in this case, no treatment at all.

3.      George Cornell was one of those unfortunate poor individuals who are victims of such a two-tiered system and ended up losing his life because of the complete failure to provide him any competent or safe medical care. Lest there be any doubt about that fact, various regulatory agencies have investigated the care provided to George and found it in gross violation of basic accepted practices in health care. The Texas Department of Health ("TDH"), the Joint Commission on the Accreditation of Healthcare Organization ("JCAHO"), and the United States Department of Health and Human Services ("HHS") have already investigated the services rendered by Defendants to George, and the government determined that the care was so deficient that it violated the basic requirements for hospitals who want to participate in treating Medicare or Medicaid patients. Based in part upon its findings, HHS determined that Parkland would be stripped of its right to treat Medicare and Medicaid patients because minimum standards were not being met at Parkland.

4.      The gross violations of George's basic civil rights, including his right to receive basic medical care is part of a well-established pattern at Parkland. Specifically, Parkland and

UTSW were aware of gross deficiencies in the Parkland emergency room since at least 2008 when, following the death of Mike Herrera who was left to die in the emergency waiting room without any attempt to provide him treatment, the Center for Medicare and Medicaid Services investigated and reported to Parkland that "the deficiencies are so serious that they constitute an immediate threat to the health and safety of any individual who comes to your hospital with an emergency medical condition."  Yet these institutions continued with their dangerous arrangement that jeopardized the poor individuals who rely on the Parkland ER.  And while those who seek care at Parkland ER receive deficient and inadequate care for their serious medical conditions, the poor who suffer from mental illness and are sent to the Parkland "Psychiatric Emergency Room" face an even worse reality where they receive no medical treatment, have their freedom taken from them, and are assaulted to the point of death. That is what happened to George, and tragically, he is not alone.  George was a victim of brutal and unconstitutionally excessive force which, along with the absence of attention to his medical needs, caused his death.

    5.    This lawsuit is about holding these institutions accountable.  They cannot be allowed to effectively kill poor individuals like George through assault, gross neglect, lack of supervision, lack of basic care, and permit them to avoid responsibility and accountability.  No longer can this county tolerate Parkland's excuse for its unacceptable health care that it is a "teaching hospital" in which mistakes will be made.  No longer can this county tolerate UTSW profiting itself in its private hospitals while also charging the county (and the federal government) for services that its faculty refuse to perform and refuse to properly supervise

students in performing.  George Cornell should not be dead today; Onie Jane Pena should still have her beloved son.  Hopefully through this lawsuit George's death will force change at institutions who are unwilling to change themselves even in the light of the harshest governmental scrutiny.

## II.
### PARTIES

6.      Plaintiff **Onie Jane Pena** is the biological mother of George Cornell, Deceased, and a resident of Dallas County, Texas.

7.      Defendant **Dallas County Hospital District d/b/a Parkland Health and Hospital System** ("Parkland")  is hospital practice that operates Parkland Memorial Hospital.  Parkland has appeared and answered and is before the Court for all purposes.

8.      Defendant **University of Texas Southwestern Medical Center at Dallas** ("UTSW") is a medical school which has appeared and answered and is before the Court for all purposes.

9.      Defendant **Kevin T. Brown, M.D.** ("Dr. Brown") was the attending physician responsible for the care and treatment of George.  At all material times, Dr. Brown was and is an employee of UTSW and may be served with process at 1200 Main #1205, Dallas, Texas 75202.

10.     Defendant **Shawn Chambers, M.D.** ("Dr. Chambers") was the resident responsible for the care and treatment of George.  At all material times, Dr. Chambers was and is an employee of Parkland and may be served with process at his last known address at 2707 N Fitzhugh Avenue Apt. 1153, Dallas, Texas  75204.

11.     Defendant **Ann M. Molinaro** ("Molinaro") was a registered nurse responsible for the care and treatment of George who also assisted in complying with the physician's orders. At all material times, Molinaro was and is an employee of Parkland and may be served with process at her last known address 2737 Belmeade Drive, Carrollton, Texas  75006.

12.     Defendant **Sherwin de Guzman** ("Guzman") was a registered nurse responsible for the care and treatment of George and who also assisted in complying with the physician's orders.  At all material times, Guzman was and is an employee of Parkland and may be served with process at his last known address 4608 Bonnywood Drive, Mesquite, Texas  75150.

13.     Defendant **Johnny Roberts** ("Roberts") was a psychiatric technician who used excessive force against George and who also assisted in complying with the physician's orders. At all material times, Roberts was an employee of Parkland and may be served with process at his last known address of 7200 Lighthouse Road, Arlington, Texas  76002.

14.     Defendant **Ronald Givens** ("Givens") was a psychiatric technician who used excessive force against George and who also assisted in complying with the physician's orders. At all material times, Givens was and is an employee of Parkland and may be served with process at his last known address 2312 Smokerise, Arlington, Texas  76016.

15.     Defendant **Alexander Achebe** ("Achebe") was a psychiatric technician who used excessive force against George and who also assisted in complying with the physician's orders. At all material times, Achebe was an employee of Parkland and may be served with process at his last known address of 837 Bailey Drive, Cedar Hill, Texas 75104.

16.     Defendant **John Quinn, M.D.** ("Dr. Quinn") was, at all relevant times, the medical director of the psychiatric emergency room and in charge of the medical administration of the psychiatric emergency room, the care and custody of the patients admitted there, the supervision, training and control of the physicians working there, and who had responsibility for establishing and/or supervising the customs, policies and practice for the physicians in the psychiatric emergency room.  Dr. Quinn may be served at his last known address of 5215 Maple Springs Blvd, Dallas, Texas 75235.

17.     Defendant **Nancy Schierding** ("Schierding") was, at all relevant times, the director of nursing of the psychiatric emergency room and in charge of administration of nursing in the psychiatric emergency room, the care and custody of the patients admitted there, the supervision, training and control of the nurses working there, and who had responsibility for establishing and/or supervising the customs, policies and practice for the nurses in the psychiatric emergency room.  She may be served at her last known address of 4214 Murwick Dr., Arlington, Texas 76016.

18.     Defendant **Vernell Brown** ("Nurse Brown") is a registered nurse and was the psychiatric emergency department unit manager and in charge of administration of technicians in the psychiatric emergency room, the care and custody of the patients admitted there, the supervision, training and control of the technicians working there, and who had responsibility for establishing and/or supervising the customs, policies and practice for the technicians in the psychiatric emergency room.  He may be served at his last known address of 823 Kirnwood, Dallas, Texas 75232.

19.     Defendant **Ronnie Joe Anderson** ("Dr. Anderson") was, at all relevant times, President and the Chief Executive Officer at Parkland. As such, he was responsible for the administration of all Parkland facilities, including the psychiatric emergency room, the care and custody of persons housed and treated at such facilities, including George Cornell, the hiring, supervision, training, discipline and control of persons working for Parkland, including the other Parkland-employed defendants named herein, and for establishing the customs, policies and practices at Parkland facilities. Dr. Anderson may be served at his last known address at 1022 Wind Ridge, Duncanville, Texas 75137.

20.     Defendant **John Jay Shannon** ("Dr. Shannon") was Executive Vice President and Chief Medical Officer at Parkland. As such, he had authority over all medical care provided at Parkland. Further, he was responsible for the administration of medical care at all Parkland facilities, including the psychiatric emergency room, the care and custody of persons housed and treated at such facilities, including George Cornell, the hiring, supervision, training, discipline and control of medical personnel working for Parkland, including the other Parkland-employed defendants named herein, and for establishing the customs, policies and practices related to medical care at Parkland facilities. Dr. Shannon may be served at his last known address at 6859 Avalon Ave., Dallas, Texas 75251.

21.     Defendant **John Gregory Fitz** ("Dr. Fitz") was Dean of UT Southwestern Medical Center at Dallas. As such, he was an employee of UTSW and had authority over all medical care provided by UTSW physicians. Further, he was responsible for the administration of medical

care provided by UTSW physicians in all Parkland facilities, including the psychiatric emergency room, the care and custody of patients of UTSW physicians housed and treated at such facilities, including George Cornell, the hiring, supervision, training, discipline and control of all UTSW physicians, including Dr. Brown, and for establishing the customs, policies and practices related to medical care by UTSW physicians.  Dr. Fitz may be served at his last known address at 6306 Mimosa Lane, Dallas, Texas 75230.

22.     Defendants Scheidering, Nurse Brown, Anderson, and Shannon are all supervisors and administrators employed by Parkland at the relevant time and are sometimes referred to herein as the "Parkland Administrator Defendants".  Defendants Quinn and Fitz are supervisors and administrators employed by UTSW at the relevant time and are sometimes referred to herein as the "UTSW Administrator Defendants".  The Parkland and UTSW Administrator Defendants, along with Drs. Brown and Chambers, Nurses Molinaro and Guzman, and Techs Roberts, Givens, and Achebe are sometimes referred to herein as the "Individual Defendants."

### III.
#### VENUE AND JURISDICTION

23.     Pursuant to TEXAS CIVIL PRACTICE & REMEDIES CODE § 15.002, venue was proper in Dallas County because all or a part of the cause of action accrued in Dallas County, Texas. The Dallas County Court at Law had jurisdiction because the amount in controversy exceeds the minimum jurisdictional amounts of the Court.  That Court also possessed jurisdiction to hear claims under 42 U.S.C. § 1983.[2]

---

[2] *See generally Nevada v. Hicks*, 533 U.S. 353, 366 (2001) ("It is certainly true that state courts of 'general jurisdiction' can adjudicate cases invoking federal statutes, such as § 1983, absent congressional specification to the contrary"); *Thomas v. Allen*, 837 S.W.2d 631, 633 (Tex.1992) (per curiam); TEX. GOV'T CODE § 25.0592.

24.     Nevertheless, Defendants Parkland and UTSW removed this case to the United States District Court on the grounds that it involved a federal question as Plaintiff's claims included a claim arising under 42 U.S.C. § 1983.  Therefore this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## IV.
### FACTUAL BACKGROUND

25.     This case involves the brutal and unnecessary death of a mentally ill man, George Cornell, at the hands of the very health care providers that had a duty to provide him health care.

26.     Shortly after midnight on February 10, 2011, George Cornell left his home in Oak Cliff and ran to a nearby fire station.  Upon arrival, he was winded and complaining about his chest.  In addition to the chest pain, George was suffering from psychiatric issues.  Firemen called the Dallas Police Department to have George taken to Parkland for medical and psychiatric evaluation and treatment.

27.     Shortly after 2 a.m. on the morning of February 11, 2011, George arrived at the Parkland psychiatric emergency room.  Contrary to the legal obligation to appropriately medically screen and stabilize all patients who present to the Emergency Room, George was not appropriately screened, stabilized or treated for his chest pain despite the fact that George had an enlarged heart and high blood cholesterol.  His records indicate that at least Nurse Guzman and Dr. Chambers knew of a potential heart issue as the intake form completed at 2:23 a.m. includes "hyperlipidemia [high cholesterol], obesity and lipid disorder…cardiovascular positive for palpitations."  Moreover, George had previously been a patient at Parkland for cardiac

conditions, so the health care providers were on notice of his medical history. Yet despite these warnings, no monitoring or treatment was given for the very heart condition that was the impetus for George being there at Parkland. Defendant Sherwin de Guzman was the nurse who initially saw George and failed to provide him any basic or necessary care or treatment. Shawn Chambers, M.D. was the admitting physician who did not evaluate or provide George basic and necessary medical care.

28.     George became agitated because of the way he was being mistreated. Approximately 24 minutes after George arrived, Dr. Chambers, with the assistance of staff he controlled and directed, administered powerful and inappropriate drugs to George in an attempt to chemically restrain George including Haldol 5 mg [Milligrams], Ativan 2 mg and Benadryl 25 mg. Moreover, either Nurse Guzman or Dr. Chambers placed George in an unmonitored seclusion room.

29.     Dr. Kevin T. Brown, with the assistance of staff he controlled and directed, administered a second dose of chemical restraint intermuscularly. These dangerous medications administered by Dr. Brown should not have been administered together or so close to the first dose, and as a result, were damaging to George Cornell because an anticholinergic medication (Benadryl) was administered along with a medication (Haldol) that is known to prolong the electrophysiological cardiac rhythm ("Q-T interval") which can cause cardiac arrhythmia and death.

30.     On two occasions, psychiatric techs Roberts, Achebe, and Givens used brutal, unnecessary, and unconstitutionally excessive force in an attempt to physically restrain George,

including holding George down in the prone position, using improper techniques and pressing his face to the floor in the seclusion room.  On the second occasion, the unconstitutionally excessive force lasted for over 15 minutes.  After George succumbed, he was left alone unattended and unsupervised, face down in the seclusion room.

31.     George was later found unresponsive in the seclusion room.  He was found without a pulse, according to the attending physician and the nurse. The medical examiner's office ruled George died of cardiac complications during "an acute psychosis from schizophrenia."  The heavy medication, coupled with the brutal physical assault of having his face forced into the floor as he was being piled upon, and then being left face down with an untreated heart issue ended up killing George Cornell.

32.     Instead of providing George adequate medical screening and treatment, the health care providers only addressed perceived psychiatric issue and initiated a course of action that left George beaten, taxed, overly-medicated and left for dead in an unmonitored and locked seclusion room that amounts to a jail cell.  At the point that Parkland and the Individual Defendants chemically and physically restrained George and placed him in a locked room at Parkland, George lost the freedom to seek his own medical care.  Parkland and the Individual Defendants became the custodian of George and had a duty to provide him his constitutionally guaranteed rights to adequate medical care, protect him from harm, and leave him free from excessive force and undue restraint.  But instead Parkland and the Individual Defendants acted with deliberate indifference to George's rights as they failed to evaluate his heart condition,

subjected him to undue restraint and unconstitutionally excessive force, and caused harm that resulted in his death.

33.    At all material times, each Individual Defendant was acting in the course and scope of his or her employment.

34.    At all material times, each Individual Defendant was acting under the color of law.

35.    At all material times a special relationship existed between George and Parkland and the Individual Defendants.  When Parkland and the Individual Defendants chemically and physically restrained George and when they locked him in a seclusion room, they were custodians of George, and he was a ward of Parkland and the Individual Defendants.  George was no longer capable of exercising free will, protecting himself, or seeking medical care.  The custodial relationship obligated Parkland and the Individual Defendants to provide constitutionally protected rights for George including his rights to adequate medical care, protection from harm, and to be free from excessive force and undue restraint.  Parkland and the Individual Defendants failed to provide those rights and instead acted with deliberate indifference to George's rights.  Parkland and the Individual Defendants' conduct violated George Cornell's rights recognized in caselaw and secured to him through the Due Process Clause of the Fourteenth Amendment and Fourth Amendment, including the rights to reasonably safe conditions, to be free from undue restraint, to adequate medical care, and to protection from harm, and to be free from excessive force.

36.     At all material times, Parkland and UTSW had a custom and persistent and widespread practice of not having appropriately trained medical providers in place to provide medical attention to those in need and that resulted in the complete failure to diagnose or treat the underlying heart condition from which George suffered.  The persistent and widespread practice of not having qualified training or supervision also led to the brutal and excessive force (without a physician's order) used by the psychiatric techs that caused George's death.  There had been prior incidents and investigations into these institutions – known to the administrators – but the administrators chose to maintain the customs despite the danger posed to the patients by the lack of supervision and qualified treatment.  The manifestation of these policies was particularly evident in the emergency and psychiatric emergency rooms where poor and indigent patients were frequently mistreated or untreated due to the lack of qualified medical care, failure to supervise care, and failure to properly train, supervise, and discipline employee misconduct.  Thus, Parkland, by and through its employees, the Parkland-employed Individual Defendants, and the UTSW-employed Individual Defendants:  (1) created a custom and allowed a custom under which unconstitutional practices occurred; (2) after learning of the violations, it failed to remedy the wrongs as evidenced by subsequent deaths in the psychiatric emergency department; and (3) it was grossly negligent in managing, supervising and training subordinates who caused or committed the wrongful acts described herein.  Parkland and the Individual Defendants each acted with reckless or callous and deliberate indifference to George's life, health and dignity as a human being, and to his constitutional and statutory rights.

37.     George was deprived of his civil rights to medical treatment and to be free from harm.  George did not have to die.  Had Parkland and the Individual Defendants afforded George his basic constitutional rights, he would not have died.  Instead, they deliberately caused George's death by the brutal and excessive force and leaving him without medical treatment to die.

## V.
### CAUSES OF ACTION AND CLAIMS FOR RELIEF

**A.     Count One:    Violation of 42 U.S.C. § 1983 by Parkland.**

38.     Plaintiff incorporates the above paragraphs by reference.

39.     At all times, a special relationship existed between Parkland and George Cornell by virtue of the custodial nature of the relationship once Parkland restrained George Cornell. By taking away George Cornell's liberty to take care of himself, Parkland became custodian of George Cornell and constitutionally obligated to provide him his civil rights.

40.     Parkland, through its employees, violated George Cornell's civil rights, including by:

   a.     Failing to provide George Cornell with constitutionally adequate medical care;

   b.     Acting with a deliberate indifference to the medical needs of George Cornell;

   c.     Using unconstitutional excessive force and subjecting him to undue restraint;

   d.     Creating a custom and allowing a custom under which unconstitutional practices occurred;

e.    Creating a custom and allowing a custom under which un-supervised and un-trained subordinates were permitted to take action against George without having qualified medical personnel directing treatment;

f.    Creating a custom and allowing a custom under which un-supervised and un-trained subordinates were permitted to use excessive force and chemically and physically restrain psychiatric patients without being properly trained to do so and without a physician's order;

g.    Creating a custom or policy under which restrained psychiatric patients would be deprived of adequate medical care;

h.    Acting with deliberate indifference in supervising and training employees who committed wrongful acts described herein;

i.    Knowingly subjecting him to pain, constitutionally excessive force, physical and mental injury, and death.

41.    By acting with deliberate indifference by failing to provide George Cornell with constitutionally adequate medical care and subjecting him to excessive force – and creating a custom or practice that permitted such to occur – Parkland knowingly subjected him to pain, physical and mental injury, and death.  At all times, Parkland had actual and constructive notice that psychiatric patients were at a profound risk of harm or death at the hands of improperly trained and unqualified subordinates in the psychiatric emergency room, but Parkland nonetheless permitted such harm to occur without remedying it.  Parkland's conduct, custom and habit was so egregious, arbitrary, brutal and indecent that it shocks the contemporary conscience.  These violations of George Cornell's civil rights caused his death, and for these violations, Plaintiff seeks all available compensatory and exemplary damages permitted at law.

**B.**   **Count Two:**   **Violation of 42 U.S.C. § 1983 by Parkland-Employed Individual Defendants in their Official and Individual Capacities (Defendants Chambers, Guzman, Molinaro, Achebe, Givens, Roberts, Schierding, Nurse Brown, Anderson, and Shannon).**

42.     Plaintiff incorporates the above paragraphs by reference.

43.     This Count is asserted against the Parkland-Employed Individual Defendants in their officials and individual capacities.

44.     At all times, a special relationship existed between Defendants Chambers, Guzman, Molinaro, Achebe, Givens, Roberts, Schierding, Nurse Brown, Anderson, and Shannon ("Parkland-Employed Individual Defendants") and George Cornell by virtue of the custodial nature of the relationship once these Defendants restrained George Cornell, which was done pursuant to Parkland's policies and customs created and administered by Schierding, Nurse Brown, Anderson and Shannon and at the direction, order and control of Chambers, and accomplished by Guzman, Molinaro, Achebe, Givens and Roberts.  By taking away George Cornell's liberty to take care of himself, the Parkland-Employed Individual Defendants became custodians of George Cornell and constitutionally obligated to provide him his civil rights.

45.     At all times relevant hereto, the Parkland-Employed Individual Defendants had a duty to provide for George's dequate medical care, protect him from harm, and leave him free from excessive force and undue restraint by virtue of their positions.  Chambers, Molinaro, Guzman, Givens, Roberts and Achebe were the hands-on providers for George.  Scheidering, Nurse Brown, Anderson and Shannon administered, controlled,  and had responsibility for the conduct of the hands-on providers and the obligation to supervise, control, regulate, hire and

fire, and develop the customs, policies and procedures for the hands-on providers.  Thus all of

them together owed the same duties to George.

46.     These Parkland-Employed Individual Defendants violated George Cornell's civil

rights, including by:

   a.     Failing to provide George Cornell with constitutionally adequate medical
          care;

   b.     Acting with a deliberate indifference to the medical needs of George
          Cornell;

   c.     Using unconstitutional excessive force and subjecting him to undue
          restraint;

   d.     Creating a custom and allowing a custom under which unconstitutional
          practices occurred;

   e.     Creating a custom and allowing a custom under which un-supervised and
          un-trained subordinates were permitted to take action against George
          without having qualified medical personnel directing treatment;

   f.     Creating a custom and allowing a custom under which un-supervised and
          un-trained subordinates were permitted to use excessive force and
          chemically and physically restrain psychiatric patients without being
          properly trained to do so and without a physician's order;

   g.     Creating a custom or policy under which restrained psychiatric patients
          would be deprived of adequate medical care;

   h.     Acting with deliberate indifference in supervising and training employees
          who committed wrongful acts described herein;

   i.     Knowingly subjecting George to pain, constitutionally excessive force,
          physical and mental injury, and death.

47.     By acting with deliberate indifference by failing to provide George Cornell with

constitutionally adequate medical care and subjecting him to excessive force – and creating a

custom or practice that permitted such to occur – the Parkland-employed Individual Defendants knowingly subjected him to pain, physical and mental injury, and death.  At all times, the Parkland-employed Individual Defendants had actual and constructive notice, based on prior incidents and the customs of Parkland, that psychiatric patients were at a profound risk of harm or death at the hands of improperly trained and unqualified subordinates in the psychiatric emergency room, but these Defendants nonetheless permitted such harm to occur without remedying it.  The Parkland-employed Individual Defendants' conduct, custom and habit was so egregious, arbitrary, brutal and indecent that it shocks the contemporary conscience. These violations of George Cornell's civil rights caused his death, and for these violations, Plaintiff seeks all available compensatory and exemplary damages permitted at law.

C.     **Count Three: Violation of the Fourteenth Amendment by the UTSW-Employed Individual Defendants in their Individual Capacities, pursuant to 42 U.S.C. § 1983 (Defendants Drs. Brown, Quinn and Fitz)**.

48.     Plaintiff incorporates the above paragraphs by reference.

49.     This Count is asserted against the UTSW-Employed Individual Defendants in their individual capacities only.

50.     At all times, a special relationship existed between Defendants Drs. Brown, Quinn and Fitz ("UTSW-Employed Individual Defendants") and George Cornell by virtue of the custodial nature of the relationship once these Defendants restrained George Cornell, which was done pursuant to UTSW's policies and customs created, controlled and administered by Quinn and Fitz and at the specific direction, order and control of Dr. Brown in this instance.  By taking away George Cornell's liberty to take care of himself, the UTSW-Employed Individual

Defendants became custodians of George Cornell and constitutionally obligated to provide him his civil rights.

51.     At all times relevant hereto, the UTSW-Employed Individual Defendants had a duty to provide for George's adequate medical care, protect him from harm, and leave him free from excessive force and undue restraint by virtue of their positions.  Dr. Brown was a hands-on provider for George, and as the attending physician had the legal responsibility for George and the right to control and direct the residents, nurses and techs also assigned to George.  Quinn and Fitz administered and controlled physicians' services, had responsibility for the conduct of the physicians including Dr. Brown, and had the obligation to supervise, control, regulate, hire and fire, and develop the customs, policies and procedures for George's physicians.  Thus all of them together owed the same duties to George.

52.     These Individual Defendants violated George Cornell's rights under the Fourteenth Amendment to the United States Constitution, including by:

   a.     Failing to provide George Cornell with constitutionally adequate medical care;

   b.     Acting with a deliberate indifference to the medical needs of George Cornell;

   c.     Using unconstitutional excessive force and subjecting him to undue restraint;

   d.     Creating a custom and allowing a custom under which unconstitutional practices occurred;

   e.     Creating a custom and allowing a custom under which un-supervised and un-trained subordinates were permitted to take action against George without having qualified medical personnel directing treatment;

f.  Creating a custom and allowing a custom under which un-supervised and un-trained subordinates were permitted to use excessive force and chemically and physically restrain psychiatric patients without being properly trained to do so and without a physician's order;

g.  Creating a custom or policy under which restrained psychiatric patients would be deprived of adequate medical care;

h.  Acting with deliberate indifference in supervising and training employees who committed wrongful acts described herein;

i.  Knowingly subjecting him to pain, constitutionally excessive force, physical and mental injury, and death.

53.  By acting with deliberate indifference by failing to provide George Cornell with constitutionally adequate medical care and subjecting him to excessive force – and creating a custom or practice that permitted such to occur – the UTSW-employed Individual Defendants knowingly subjected him to pain, physical and mental injury, and death.  At all times, the UTSW-Employed Individual Defendants had actual and constructive notice that psychiatric patients were at a profound risk of harm or death at the hands of improperly trained and unqualified subordinates in the psychiatric emergency room, but these Defendants nonetheless permitted such harm to occur without remedying it.  The UTSW-employed Individual Defendants' conduct, custom and habit was so egregious, arbitrary, brutal and indecent that it shocks the contemporary conscience.  These violations of George Cornell's civil rights caused his death, and for these violations, Plaintiff seeks all available compensatory and exemplary damages permitted at law.

**D.   Count Four:   Negligence of Parkland**

54.  Plaintiff incorporates the above paragraphs by reference.

55.     At all times relevant hereto, the health care providers at Parkland treating George Cornell were acting in the course and scope and in furtherance of their employment or agency relationship as health care providers at Parkland, and as such, Parkland is vicariously liable for the negligence of the health care providers treating George Cornell.  The health care providers at Parkland treating George Cornell negligently and grossly negligently fell below the standard of care for such health care providers in the same or similar circumstances, including but not limited to the following particulars:

a.      Parkland's employees negligently used tangible property – medications and the seclusion room – that were property of Parkland.

b.      Shawn Chambers, M.D. negligently administered the prescription drugs Haldol, Ativan and Benadryl and in so doing used and misued tangible personal property of Parkland's in a negligent manner.  Dr. Chambers had the exclusive non-delegable duty to prescribe medications, and the initial medications were ordered pursuant to his license, so he is therefore legally responsible for their use.  Dr. Chambers ordered the initial dosing of inappropriate medications, and fully controlled the type, timing, and method of delivery of the medications, and as such, was legally responsible for their use, controlled the administration of the drugs, and was the user of the medications for purposes of application of the Texas Tort Claims Act.  The negligent use of dangerous drugs caused dangrous heart issues for George that ultimately were a cause of George's death according to the medical examiner.

c.      Shawn Chambers, M.D. and/or Sherwin de Guzman negligently used or misused the seclusion room on the first occasion that George was forced into one.  Dr. Chambers had the legal duty and responsibility to order use of the seclusion room, but the medical records appear to suggest that Nurse Guzman assumed that duty and responsibility and ordered its usage without a proper physician order.  Regardless, it was an employee of Parkland acting in her/his scope of employment that fully controlled the type, timing and method of monitoring the seclusion room the first time it was used, and therefore Parkland was the user of the seclusion room for purposes of application of the Texas Tort Claims Act.  The seclusion room was defective in that it was not properly monitored by a person constantly

and did not have appropriate monitoring mechanisms and equipment in place such that it was an unreasonable danger to any patient placed inside it.   The inability to monitor patients in the seclusion room allowed George's condition to deteriorate.

d.      Nurse Molinaro negligently misused the seclusion room in that she failed to monitor it and ensure that George was in a safe condition.  The failure by Nurse Molinaro to properly use the secluion room and remedy the fact that George was not being monitored caused George's fatally deteriorating condition to go under treated and caused George to die.

e.      Technicians Roberts, Givens and Achebe assisted in the administration of drugs, physical restraint, and use of the seclusion room, and their conduct was done at the direction and control of the physicians and nurses.  For the same reasons as set forth above, the Technicians' actions were negligent use or misuse of tangible personal property for purposes of application of the Texas Tort Claims Act that ultimately were a cause of George's death according to the medical examiner.

56.     As a direct and proximate result of Parkland and its employees' acts or omissions as set forth above, including those employees' negligent use of improper medication and misuse of a defective seclusion room caused damage.  Parkland's acts or omissions are the proximate cause of Plaintiff's damages resulting from this tragic and preventable death.

**E.     Count Five:   Negligence of UTSW.**

57.     Plaintiff incorporates the above paragraphs by reference.

58.     At all relevant times, Kevin T. Brown, M.D. was an employee of UTSW, acting in the course and scope of his employment.  Dr. Brown owed a duty to George to act as an ordinarily prudent physician would in the same or similar circumstances.  Dr. Brown failed to adhere to the standard of care, including but not limited to the following two particulars:

a.      Kevin T. Brown, M.D. negligently administered the second dose of the prescription drugs Haldol, Ativan and Benadryl and in so doing used and misued tangible personal property of Parkland's in a negligent manner.

Dr. Brown had the exclusive non-delegable duty to prescribe medications, and the second dose of medications were ordered pursuant to his license so he is therefore legally responsible for their use.  Dr. Brown ordered the second dosing of inappropriate medications, and fully controlled the type, timing, and method of delivery of the medications.  As such, Dr. Brown was legally responsible for their use, in control of the administration of the drugs, and was the user of the medications for purposes of application of the Texas Tort Claims Act.  The negligent use of dangerous drugs, including the timing of the second dose so close the first, caused heart issues that ultimately were a cause of George's death according to the medical examiner.

b.   Kevin T. Brown, M.D. negligently used and misused the seclusion room in ordering George Cornell to placed into a second room.  Dr. Brown had the exclusive and non-delegable duty to order and control the use of the seclusion room.  Dr. Brown ordered that the seclusion room be used, and he controlled the use of the room, the time George was placed into it, the time George would remain in it, how it should be monitored, and whether George's condition required monitoring or removal.  Therefore Dr. Brown was the user of the seclusion room for purposes of application of the Texas Tort Claims Act.   The second seclusion room was likewise defective in that it was not properly monitored by a person constantly and did not have appropriate monitoring mechanisms and equipment in place such that it was an unreasonable danger to any patient placed inside it.  The inability to monitor patients in the seclusion room allowed George to be left un-monitored and to die without timely and appropriate medical intervention.

59.   As a direct and proximate result of Dr. Brown's and UTSW's negligent acts or omissions as set forth above, it was foreseeable that George would be exposed to death.  George in fact died.  Dr. Brown's negligent acts or omissions are a proximate cause of Plaintiff's damages resulting from this tragic and preventable death.

**F.   Count Six:   Exemplary Damages against Individual Defendants.**

60.   Plaintiff incorporates the above paragraphs by reference.

61.     Plaintiff avers that the conduct of Individual Defendants cited above, including failing to give George Cornell appropriate medical care, use of excessive force and the development of a custom of practice that such actions occur unsupervised as a result of the operation of the two-tiered system amounted to deliberate indifference and gross negligence for which punitive damages must justly be awarded.   Policymaking officials are and were consciously aware of the two-tiered system, lack of monitoring causing dangerous treatment and lack of treatment provided to patients in the emergency room, and the extreme degree of risk to patients and problems attendant with that system, but nevertheless proceeded with disregard for the rights, safety and welfare of psychiatric patients at Parkland, including George Cornell. Plaintiff avers that the violations of civil rights set forth above, and the custom that permitted such violations, establishes that Individual Defendants were malicious, intentional, or recklessly or callously indifferent to the protected rights of George Cornell such that the conduct justifies punitive damages.

62.     For this gross negligence and punitive damage, Plaintiff specifically pleads for the recovery of exemplary damages as set forth herein, as provided for under state law and under 42 U.S.C. § 1983.

## VI.
### AGENCY

63.     At all relevant times, UTSW and Parkland were engaged in a joint venture, and therefore they should be equally liable for the actions of the other.

64.     At all relevant times, the technicians and nurses assisting the physicians were subject to the control, direction and supervision of the physicians, including Dr. Brown and Dr.

Chambers, such that the physicians are legally responsible for the actions taken by the nurses and technicians who were assisting in complying with the physician's orders.

65.     At all relevant times, the UTSW and Parkland Administrators had the right to direct, administer, supervise, manage, hire and fire and otherwise control the physicians, nurses and technicians that were treating George such that the Administrators are legally responsible for the actions taken by the treaters.

## VII.
### DAMAGES

**A.     Damages of the Estate of George Cornell**

66.     Pursuant to TEX. CIV. PRAC. & REM. CODE §71.021 and the uncapped damages recoverable under 42 U.S.C. § 1983, George Cornell's estate is entitled to and seeks damages for the following elements from the time of the incident complained of until the time of his death:

      a.     Physical pain and suffering of George Cornell;

      b.     Mental anguish of George Cornell;

      c.     Humiliation;

      d.     Loss of dignity;

      c.     Physical impairment, physical incapacity and physical disability; and

      d.     Funeral expenses.

67.     As a result of the foregoing, George Cornell incurred injury and damages in an amount in excess of the minimum jurisdictional limits of this court, and Plaintiff pleads for such damages as authorized in this case.  Plaintiff further requests that this case be tried to a jury and

that the Estate of George Cornell should be awarded fair and reasonable damages as determined by the jury.

**B.     Damages of Onie Jane Pena**

68.     Onie Jane Pena, as a wrongful death beneficiary and mother of George Cornell, seeks damages pursuant to the Wrongful Death Statute and pursuant to the uncapped damages available under 42 U.S.C. § 1983 including, but not limited to the following:

a.     The reasonable cash value of such future contributions that George Cornell would, in reasonable probability, have made during his lifetime, had he lived;

b.     The reasonable cash value of services that, in reasonable probability, would have been rendered by George Cornell in aid of Onie Jane Pena during her lifetime, had he lived;

c.     The loss of affection, comfort, companionship, society, emotional support, and love which Onie Jane Pena would, in some reasonable probability have received from George Cornell, had he lived;

d.     Physical pain and suffering in the past and which, in reasonable probability, Onie Jane Pena will continue to suffer in the future;

e.     Mental anguish in the past and which, in reasonable probability, Onie Jane Pena will continue to suffer in the future;

f.     Damages for humiliation and loss of dignity in the past and which, in reasonable probability, Onie Jane Pena will continue to suffer in the future.

g.     Reasonable medical expenses in the past and future for appropriate counsel for Onie Jane Pena; and

h.     Recovery for the loss of present value of all assets that George Cornell, in reasonable probability, would have added to the estate and left at natural death to Onie Jane Pena.

69.     The above damages are in excess of the jurisdictional limit of this Court.

C.     Exemplary Damages

70.     Plaintiff alleges that each and every negligent act and/or omission of the Individual Defendants and their agents, as set forth above, constituted a deliberate indifference to and violation of the civil rights of George Cornell for which punitive damages are sought and must be awarded.   Plaintiff additionally alleges when viewed objectively from the standpoint of policymakers at the time policies were established, involved an extreme degree of risk, considering the probability and magnitude of the physical harm to others in that the Individual Defendants had actual subjective awareness of the risks involved, but nevertheless proceeded with conscious indifference to the rights, safety or welfare of Plaintiff, and as such, such conduct amounts to gross negligence or malice, as those terms are defined by law, so as to give rise to an award of exemplary or punitive damages, for which Plaintiff now pleads, jointly and severally, against the Individual Defendants. Additionally, by reason of such conduct, Plaintiff is entitled to and therefore asserts a claim for punitive and exemplary damages in an amount sufficient to punish and deter the Individual Defendants, and others like them, from such conduct in the future.

### VIII.
### PRE-JUDGMENT AND POSTJUDGMENT INTEREST

71.     Plaintiff requests pre-judgment and post-judgment interest in accordance with the maximum legal interest rates allowable as interpreted under the laws of the State of Texas.

## IX.
### REQUEST FOR A JURY TRIAL

72.     Plaintiff demands a jury trial on all issues so triable and had previously paid the

applicable fee.

## X.
### PRAYER

73.     Plaintiff prays that Defendants be cited to appear and answer herein, and that

upon final determination of these causes of action, Plaintiff receive a judgment against

Defendants, jointly and severally,  awarding the Plaintiff as follows:

    a.     Actual, compensatory, consequential, exemplary, and punitive damages, in an amount in excess of the minimal limits of the Court against the named Defendants;

    b.     Costs of Court;

    c.     Prejudgment interest at the highest rate allowed by law from the earliest time allowed by law;

    d.     Interest on judgment at the highest legal rate from the date of judgment until collected; and

    e.     All such other and further relief at law and in equity to which the Plaintiff may show herself to be justly entitled.

Respectfully submitted,

_[signature]_

CHARLA G. ALDOUS
State Bar. No. 20545235
BRENT R. WALKER
State Bar No. 24047053
ALDOUS LAW FIRM
2311 Cedar Springs Rd., Suite 200
Dallas, TX 75201
Phone: (214) 526-5595
Fax:     (214) 526-5525

ATTORNEYS FOR PLAINTIFF


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was served upon all counsel of record via the Court's electronic filing system on the 18th day of October, 2011.

_[signature]_

CHARLA G. ALDOUS