IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ONIE JANE PENA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:12-CV-439-N |
| | § | |
| DALLAS COUNTY HOSPITAL | § | |
| DISTRICT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## <u>ORDER</u>

This Order addresses Defendant Sherwin De Guzman's motion for summary judgment [Doc. 114] ("DeGuzman Mot."); Defendant Ronnie Joe Anderson's motion for summary judgment [119] ("Anderson Mot."); Defendants Nancy Schierding and Vernell Brown's ("Nurse Brown") motion for summary judgment [121] ("Schierding, Nurse Brown Mot."); Defendant Johnny Roberts's motion for summary judgment [122] ("Roberts Mot."); Defendant Kevin T. Brown's ("Dr. Brown") motion for summary judgment [126] ("Dr. Brown Mot."); and Defendants Ronald Givens and Alexander Achebe's motion for summary judgment [130] ("Givens, Achebe Mot.").[1] The Court denies the motions.

---

[1]Plaintiff has since dismissed several of the parties who had joined in these motions. *See* Stipulation of Dismissal [151] (voluntarily dismissing all claims against Defendants Shawn Chambers, Ann M. Molinaro, John Quinn, John J. Shannon, and John Gregory Fitz).

# I. THE DEATH OF GEORGE CORNELL

## A. Arrival at Parkland

George Cornell was a 49 year old man with a history of cardiac and psychological issues. *See* Pena Resp., Ex. A 107 [140-1] [hereinafter, Parkland Medical Records].[2]  After midnight on February 10, 2011, Cornell went to a fire station in Oak Cliff and complained that people were chasing him.  A fireman contacted the Dallas Police Department.  *Id.*  Dallas police officers arrived at the fire station and took Cornell to Parkland for treatment.

## B. Admission to Parkland

The police brought Cornell to the Parkland psychiatric emergency room (the "Psych ER") at approximately 2:04 a.m.  Parkland Medical Records 106.  Cornell was handcuffed and considered APOWW, *i.e.*, apprehended by a police officer without a warrant.  *Id.*; Pena Resp., Ex. O 49 [hereinafter, Dr. Brown Depo.].  Dr. Shawn Chambers, in the presence of Dr. Kevin Brown and nurse Sherwin DeGuzman, took a brief history from Cornell and asked about his complaints.  Cornell informed Dr. Chambers that he had recently been diagnosed with "tachycardia," and Dr. Chambers noted that Cornell had palpitations on his intake form.  *Id.* at 63–65.  Cornell also told Dr. Chambers that people had stolen his lottery ticket and were chasing him.  Dr. Brown Depo. 52.  Though apparently suffering from psychiatric issues, Cornell was initially cooperative.  *Id.*  Pursuant to Dr. Brown's authorization, Dr. Chambers admitted Cornell to the Psych ER.

---

[2]Page numbers refer to the page of the exhibit itself and not the page of the appendix.

Johnny Roberts, a technician in the Psych ER, then attempted to take and record Cornell's vital signs, including his pulse, blood pressure, and respirations. Pena Resp., Ex. P 39 [140-2] [hereinafter, Roberts Depo.]. Roberts found that Cornell's pulse was 124 beats per minute, his blood pressure was 142/105 mm Hg, and his respirations were 17 breaths per minute. Parkland Medical Records 99, 104. Because the readings for Cornell's blood pressure and pulse were abnormally high, Roberts attempted to take Cornell's vital signs a second time. Roberts Depo. 43–44. The machine malfunctioned on the second attempt. *Id.* at 75. When Roberts tried to take Cornell's vital signs for a third time, Cornell became agitated and refused to cooperate. *Id.* at 77.

After Roberts's attempt to take Cornell's vital signs, no other physician, technician, or nurse treated Cornell for any cardiac issues. Dr. Brown Depo. 65.

### C. First Seclusion Room

As Cornell began resisting, Roberts asked another technician, Ronald Givens, to help him calm Cornell so that he could take his vital signs. Roberts MSJ, Ex. 5 3–4 [124-5] [hereinafter, Roberts Decl.]. Cornell continued to resist and attempted to leave the Psych ER. *Id.* Roberts saw Dr. Brown in the hall and informed him that Cornell was resisting and attempting to leave. *Id.* Givens placed Cornell in a physical restraint – either a "basket hold," as Givens testified during his deposition, or an "elbow-to-hip containment" as he averred in his declaration – and began pushing Cornell into a seclusion room used to restrain uncooperative patients in the Psych ER. Pena Resp., Ex. M 29–30 [hereinafter, Givens Depo.]; Givens MSJ, Ex. 1 7–8 [132-1] [hereinafter, Givens Decl.].

The technicians guided Cornell to a mat in the seclusion room. The testimony of the technicians varies from the time of the Centers for Medicare and Medicaid Services ("CMS") investigation to the time of their depositions as to whether they held him on his side or on his stomach. *Compare* Roberts Decl. 5 (side), *with* Givens Decl. 10 ("[W]e rolled Cornell to his stomach so that the nurse could give the injection in Cornell's hip area . . . ."); Pena Resp., Ex. B 5 [hereinafter, CMS Report] ("[T]he patient was placed on his stomach for the administration of an injection.").[3]  DeGuzman entered and administered an injection to subdue Cornell. Roberts Decl. 5–6. The injection contained a combination of Haldol, Ativan, and Benadryl. Parkland Medical Records 108, 110. The technicians held Cornell down for some time after DeGuzman left, though the accounts vary. Givens Decl. 11 ("a minute or two"); CMS Report 5 (Roberts told investigators "several minutes"); CMS Report 6–7 (DeGuzman told investigators that technicians held Cornell down for "maybe five

---

[3]Several Defendants object to the admission of the CMS Report. *See, e.g.*, Roberts Objections 2–3 [150]. The Court overrules their objection. The CMS Report, which is authorized by 42 C.F.R. § 488.7, falls within Federal Rule of Evidence 803(8)(a)(iii)'s exception for records that set out "factual findings from a legally authorized investigation." Courts have routinely admitted investigatory reports conducted by government agencies. *See, e.g.*, *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988) (admitting an investigative report issued by the Navy Judge Advocate General after a plane crash); *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 456 (5th Cir. 2009) (admitting a Department of Justice investigative report regarding conditions in Dallas jails). (The Court notes that the 2011 amendments to the Rules of Evidence removed Rule 803(8)(c), which formerly addressed the exception for investigative reports. But the committee notes indicate that the amendments to the Rules of Evidence were intended to make the Rules more easily understood and do not "change any result in any ruling on evidence admissibility." FED. R. EVID. 803 advisory committee's note.)

minutes").  At some point after DeGuzman administered the injection, Roberts and Givens left the seclusion room.  Givens Decl. 11.

After the technicians left the room, Cornell again became agitated and began yelling. He pulled up a piece of vinyl tile from the floor and banged it against the door.  *Id*. at 12.  A third psych technician, Alexander Achebe, persuaded Cornell to give him the tile in exchange for a juice box.  *Id.*  Because Cornell had pulled up the flooring, the technicians moved him to a second seclusion room.  *Id.*

### D.  Second Seclusion Room

As Cornell neared the second seclusion room, he crushed the juice box and began physically resisting the technicians.  *Id.* at 13.  The technicians restrained Cornell and placed him on a mat in the room.  A nurse again administered a second injection containing the same medications to calm Cornell.  Parkland Medical Records 108, 110.  Plaintiff's expert, Dr. Glenn Currier noted that two of the medications administered, Haldol and Benadryl, can cause cardiac arrhythmia and death.  Report of Glenn Currier 8 [29].

Accounts differ as to how Cornell was placed on the mat.  The technicians more recently testified that they placed Roberts on his side and restrained him for only a few minutes after the injection.  Roberts Depo. 122 ("[W]e restrained him enough to get an injection site, so it was no more than two seconds . . . then he was right back on his side."); Givens Deposition 121 (Technicians left after "two minutes"); Pena Resp., Ex. N 110 [hereinafter, Achebe Depo.] (testifying that there was no way the technicians held Cornell down for ten to fifteen minutes after injection was administered).  Earlier reports indicated

ORDER – PAGE 5

that the technicians placed him on his stomach and held him for as long as ten to fifteen minutes after the injection.  CMS Report 7 (Roberts told investigators that "[t]he patient's arms were crossed in front of his chest and he was placed on his stomach.  He received a second shot.  The [technicians] restrained him about 10 to 15 minutes after the injection.  The physician came in and told the [technicians] to let him up."); CMS Report 37 (Givens told investigators the same).  Holding a patient in a prone position for several minutes can obstruct the airway and cause asphyxiation.  Pena Resp., Ex. U 64 [hereinafter, Baker Depo.].  Technicians were trained not to hold patients in the prone position for more than one minute.  Pena Resp., Ex. L 49 [hereinafter, DeGuzman Depo.]; Pena Resp., Ex. K 41 [hereinafter, Molinaro Depo.]; Baker Depo. 24–26, 30–31; Roberts Depo. 33, 34; Givens Depo. 75, 81.  Dr. Brown told the technicians to release Cornell.  CMS Report 6.  The technicians left the room.

Accounts also differ as to whether and how often the technicians observed Cornell after he was placed in the second seclusion room.  Cornell's medical records reflect that Roberts observed Cornell at 3:19 a.m. and 3:30 a.m.  Parkland Medical Records 110.  But Roberts testified later that he did not observe Cornell at these times, though Achebe and Givens may have observed Cornell.  Roberts Depo 191.

### E.  Cornell's Death

At 3:31 a.m., nurse Ann Molinaro found Cornell "lying in a prone position" with his right arm "beneath him with his hand pointed to the ceiling."  Molinaro Depo. 178.  His hand was "very mottled," cyanotic, and there were no "spontaneous respirations."  Parkland

Medical Records 115; Molinaro Depo. 178. Molinaro summoned Dr. Brown who detected a weak pulse and no respirations. Parkland Medical Records 115. He attempted CPR. *Id.* Molinaro called a Code Blue. *Id.* Healthcare workers from Parkland's Main Emergency Department arrived at 3:37 a.m. and moved Cornell to the main emergency room. *Id.* Cornell died at 3:56 a.m. *Id.*

Dr. Jeffrey Barnard, Chief Medical Examiner of Dallas County, performed the autopsy. Pena Resp., Ex. E 5 [hereinafter, Autopsy Report]. He found two focal abrasions on Cornell's left forehead. *Id.* at 2. He initially identified the cause of death as "cardiac dysrhythmia due to cardiac hypertrophy (etiology unknown) during an acute psychosis from paranoid schizophrenia" and listed the death as "natural." *Id.* at 5. He amended his report after the investigation into Cornell's death to reflect that the cause and manner of Cornell's death were undetermined. Pena Resp., Ex. F 1 [hereinafter, Amendment to Autopsy Report]. He also noted that he was considering "mechanical asphyxia," i.e. compression, as a possible cause of death.   Pena Resp., Ex. X 1–2 [hereinafter, Medical Examiner's Supplemental Narrative]. He further noted that the medications used to subdue Cornell may have contributed. *Id.* Based on his analysis, Dr. Barnard found that there were three potential causes of death: (1) mechanical compression; (2) his underlying cardiac issues; or (3) effects of the medications administered prior to his death. *Id.*

### F.  Supervision and Management of Hospital Personnel

Shierding was Parkland's Director of Nursing for Psychiatric Services at the time of Cornell's death in the Psych ER. Pena Resp., Ex. Q 24 [hereinafter Shierding Depo.]. Nurse

Brown was Unit Manager III for the Psych ER and was responsible for the Psych ER staff, including nurses and techs.  Anderson, App. 19 [120-1] [hereinafter, Nurse Brown Decl.]. During her deposition, Shierding recalled other episodes of patients complaining of improper treatment in the Psych ER.  *Id.* at 26–28; 31, 54–55.  After Cornell's death, Parkland terminated Shierding's employment because "policies and procedures were not up to date." *Id.* at 181–82.  The CMS Report also noted that DeGuzman's training in restraint and seclusion had lapsed prior to Cornell's death, of which Nurse Brown and Shierding, as DeGuzman's supervisors, should have been aware.  CMS Report at 2, 8.

Dr. Anderson was the CEO of Parkland for thirty years until 2011 after Cornell's death. Pena Resp., Ex. T 9 [hereinafter, Anderson Depo.].  Throughout this time, Parkland was cited several times by CMS for violating the Emergency Medical Treatment and Labor Act ("EMTALA").  In 2008, Dr. Anderson received a letter from CMS stating that Parkland "fail[ed] to provide appropriate medical screening examination to determine whether an emergency medical condition existed" and that the "deficiencies [we]re so serious that they constitute an immediate threat to the health and safety of any individual that comes to [Parkland] with an emergency medical condition."  Pena Resp., Ex. I 1 [hereinafter, CMS 2008 Letter].[4]  After Cornell's death, CMS issued another report detailing ongoing problems at Parkland, noting that Parkland had been "under near constant surveillance and investigation by" the Texas Department of State Health Services and CMS due to an

---

[4]Defendants object to the admission of the CMS 2008 letter as irrelevant.  *See* Shierding, Nurse Brown, and Dr. Anderson Objections 7 [153].  The Court overrules the objection.

unusually high number of patient complaints, injuries, and deaths at Parkland. Pena Resp., Ex. X 4 [hereinafter, Alvarez & Marsal Report].[5]  In 2012, independent consultants found conduct at Parkland that violated patients' rights to receive care in a safe setting, be free from abuse and neglect, and to be free from unnecessary restraints or seclusion. *Id.* at 96–97.  The consultants found these violations particularly pervasive in the Psych ER. *Id.* at 175–76. The consultants observed that problems in leadership, accountability, and culture were in part to blame. *Id.* at 45.

## II. Standard for Summary Judgment

A trial court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  In making this determination, a court must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a party bears the burden of proof on an issue, "he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis omitted).

---

[5]Finally, Defendants object to the admission of this report.  Shierding, Nurse Brown, and Dr. Anderson Objections 8–9.  The Court overrules the objection based on Federal Rule of Evidence 803(8)(a)(iii). *See supra* Note 3.

When the nonmovant bears the burden of proof, the movant may demonstrate entitlement to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) arguing that there is no evidence to support an essential element of the nonmovant's claim or affirmative defense. *Celotex*, 477 U.S. at 322–25.

Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Moreover, "conclusory allegations, speculation, and unsubstantiated assertions" will not satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1). Indeed, factual controversies are resolved in favor of the nonmoving party "only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999) (citing *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

### III. STANDARD FOR QUALIFIED IMMUNITY

"Qualified immunity is a defense available to public officials performing discretionary functions '. . . insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.' " *Noyola v. Texas Dep't of Human Res.*, 846 F.2d 1021, 1024 (5th Cir. 1988) (quoting *Harlow v. Fitzgerald*,

ORDER – PAGE 10

457 U.S. 800, 818 (1982)).  The doctrine of qualified immunity balances two interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Because "qualified immunity is designed to shield from civil liability 'all but the plainly incompetent or those who knowingly violate the law,' " denial of qualified immunity is appropriate only in rare circumstances. *Brady v. Ford Bend Cnty.*, 58 F.3d 173, 173–74 (5th Cir. 1995) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To resolve a public official's qualified immunity claim, a court considers two questions.  First, has the plaintiff shown a violation of a constitutional right? *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  And, second, was the right "clearly established" at the time of the public official's alleged misconduct? *Id.*  The second inquiry is critical: unless the official violated a clearly established constitutional right, qualified immunity applies. *Pearson*, 555 U.S. at 231.  "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 235.  "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

### IV.  CORNELL'S RIGHTS WERE CLEARLY ESTABLISHED ON FEBRUARY 10, 2011

Plaintiff alleges that Defendants' actions violated three of Cornell's constitutional rights.  First, Plaintiff argues that Roberts, Achebe, and Givens used excessive force against

ORDER – PAGE 11

Cornell in violation of his Fourth Amendment.  Second, Plaintiff argues that Roberts, DeGuzman, and Dr. Brown violated Cornell's right to due process by denying him medical care for his heart condition.  And, third, Plaintiff contends that Shierding, Dr. Anderson, and Nurse Brown contributed to these constitutional violations by inadequately supervising the hospital and Psych ER.  As the Court may begin with either step of the two-step *Saucier* inquiry, the Court begins with the second and considers whether the constitutional rights asserted by Plaintiff were clearly established on February 10, 2011.

### A.  Standard for Finding Clearly Established Rights

A right is "clearly established under the second step of the qualified immunity analysis" if " '[t]he contours of that right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Flores*, 381 F.3d at 399–400 (quoting *Anderson*, 483 U.S. at 640)).  " '[T]he salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.' " *Tolan*, 134 S. Ct. at 1866 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  Importantly, the Supreme Court has not required that a plaintiff demonstrate the existence of a "fundamentally similar" or "materially similar" case to show that a right is clearly established.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  Rather, there may be "notable factual distinctions between the precedents relied on . . . so long as the prior decisions g[i]ve reasonable warning that the conduct then at issue violated constitutional rights."  *Id.* at 740.  "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."  *Id.* at 741.

The "operation of this standard . . . depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Though, on an abstract level, each individual has a clearly established Fourth Amendment right to be free of unreasonable searches and seizures, for example, a "test of 'clearly established law' . . . applied at this level of generality . . . would bear no relationship to the 'objective legal reasonableness' " portion of the test. *Anderson*, 483 U.S. at 639. "Plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* Accordingly, the allegedly violated right must be more particularized. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640.

## B. Excessive Force

On a general level, the proposition that a use of force violates the Fourth Amendment when it is excessive under objective standards of reasonableness is clearly established. *Saucier*, 533 U.S. at 201–02. But the question before the Court must be more particularized. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). Thus, the appropriate inquiry here is whether it would have been clear to a reasonable technician that his conduct in holding a patient in a prone position for an extended period of time would be unlawful in light of the patient's condition and the technician's training.

Several courts have found that restraining a suspect or patient in a prone position can constitute excessive force. For example, in *Champion v. Outlook Nashville, Inc.*, police officers responded to an emergency call regarding an autistic man who had become agitated and violent while shopping with his caretaker. 380 F.3d 893, 896 (6th Cir. 2004). The police subdued the man by bringing him to the ground, holding him in a prone position (*i.e.*, on his stomach) for several minutes, and spraying his face with pepper spray. *Id.* at 896–98. The Sixth Circuit found that it was clearly established "that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Id*. at 903 (6th Cir. 2004). The Sixth Circuit found persuasive the fact that the officers had been trained not to hold patients in the position and were aware that the individual they confronted was mentally ill or disabled. *Id.* at 904. Several other courts, including the Fifth Circuit, have reached similar conclusions. *See, e.g.*, *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056–57 (9th Cir. 2003) (holding that police officers transporting mentally ill patient used excessive force when they placed their weight on his neck and torso as he lay handcuffed on the ground and citing other cases involving "compression asphyxia"); *Simpson v. Hines*, 903 F.2d 400, 403 (5th Cir. 1990) (correction officers used excessive force when they placed an inmate in a neckhold and exerted significant pressure to hold him down, resulting in his asphyxiation).

That the state actors involved in these cases were police officers is immaterial. Though the facts of those cases and this one are not identical, they are closely analogous. "[E]xposure to liability does not depend merely on the profession of the government actors."

*McKenna v. Edgell*, 617 F.3d 432, 438–39 (6th Cir. 2010). Thus, the fact that this case involves hospital personnel while other, similar cases involve police officers does not weigh against a finding that the right was clearly established in the circumstances of this case. *Champion*, 380 F.3d at 902 ("The Supreme Court has refused to require that a plaintiff demonstrate the existence of a 'fundamentally similar' or 'materially similar' case. There can be 'notable factual distinctions between the precedents relied on . . . so long as the prior decisions g[i]ve reasonable warning that the conduct then at issue violated constitutional rights.' '[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.' " (quoting *Hope v. Pelzer*, 536 U.S. 730, 740–41 (2002))).

In addition to legal precedent, Plaintiff has also shown that the technicians were trained not to use this kind of hold for extended periods of time. Each of the technicians was trained and certified in the Satori Aggression Management Alternatives ("SAMA"), which counseled against holding patients in a prone position for an extended period of time. Molinaro Depo. 41. Melvin Baker, the psych technician who trained Roberts and Givens testified that he instructed the technicians that holding a patient face down could cause medical compromise, including obstruction of the airway. Baker Depo. 74; *see also* Roberts Depo. 33–34; Givens Depo. 75, 81. Thus, Roberts, Givens, and Achebe were aware that this use of force was dangerous and could harm patients.

Defendants argue that courts have refused to apply excessive force doctrine where the force was used in the context of treatment. Defendants rely on *Peete v. Metropolitan Government of Nashville and Davidson County*, in which emergency responders restrained

ORDER – PAGE 15

an individual undergoing a seizure in a prone position to administer medical care. 486 F.3d 217, 219–20 (6th Cir. 2007). The Sixth Circuit held that the responders were entitled to qualified immunity because neither the patient nor his grandmother asked the responders to stop treating him and because the patient was not communicative or conscious. *Id.* at 222. There was no intent to interfere with his liberty. *Id.* The paramedics were simply attempting to render aid. *Id.*

The instant case is distinguishable from *Peete*. Here, the technicians did interfere with Cornell's liberty interest. Cornell was initially brought to the hospital handcuffed. Though he was initially cooperative, he later resisted and attempted to leave the hospital. The technicians forcibly restrained him. And their restraint of Cornell was not intended to treat his condition but rather to subdue him and prevent him from leaving the hospital. And, throughout this time, Cornell was conscious and nonconsenting. *See Peete*, 486 F.3d at 222 (distinguishing *Peete* from *Champion* on this basis). Thus, this case more closely resembles the facts in *Champion* than those in *Peete*.

The Court concludes that a reasonable technician, based on the law and their training, would have understood that holding Cornell in the prone position for an extended period of time would be dangerous and an unreasonable use of force. Though the Court "recognize[s] that the [technicians] perhaps did not intend to harm [Cornell]," this "consideration is immaterial . . . because the qualified immunity doctrine is an objective one; motive is irrelevant." *Champion*, 380 F.3d at 904. The Court therefore concludes that this right was clearly established at the time of Cornell's death.

ORDER – PAGE 16

### C.  Denial of Medical Care

Though the Due Process Clause generally "does not confer an entitlement to *government aid* as may be necessary to realize the advantages of liberty guaranteed by the Clause," a special duty of care may arise "when the state deprives a citizen of his liberty so that he is unable to care for himself." *Walton v. Alexander*, 44 F.3d 1297, 1302 (5th Cir. 1995) (emphasis in original) (citing *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 196 (1989); *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976)).  The Supreme Court has held that the state has affirmative obligations to detainees, prisoners, and others involuntarily restrained by the state:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs – *e.g.*, food, clothing, shelter, medical care, and reasonable safety – it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.  The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

*DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 200 (1989).  The Fifth Circuit has construed *DeShaney* strictly and held that "only when the state, by its affirmative exercise of power, has custody over an individual *involuntarily or against his will* does a 'special relationship' exist between the individual and the state."  *Walton*, 44 F.3d at 1303–04 (emphasis in original).  The Fifth Circuit recognizes three circumstances giving rise to a special relationship: (1) incarceration, (2) involuntary institutionalization, and (3)

ORDER – PAGE 17

placement of children in foster care. *Doe v. Covington Cnty. Sch. Dist.*, 675 F.3d 849, 856 (5th Cir. 2012).

On several occasions, the Fifth Circuit has found that state-employed medical personnel may be held liable for ignoring a prisoner's serious medical condition. *See, e.g.*, *Loosier v. Unknown Medical Doctor*, 435 F. App'x 302, 306–07 (5th Cir. 2010) (unpub.) (finding that prisoner had stated a deliberate indifference claim where he alleged that he began choking on vomit and the medical staff ignored a prison guard's pleas for help); *Thompson v. McCoy*, 365 F. App'x 601, 602–03 (5th Cir. 2010) (unpub.) (finding that a prison doctor was not entitled to qualified immunity where prisoner raised an issue of fact as to whether the doctor refused to treat the prisoner's severe and recurring asthma); *United States v. Gonzales*, 436 F.3d 560, 573 (5th Cir. 2006) (finding that there was sufficient evidence of deliberate indifference where the officers failed to seek medical assistance for a detainee who was lying on the ground with a broken neck, "foaming at the mouth," and begging for help); *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003) (finding that boot-camp officials were not entitled to qualified immunity where they failed to call an ambulance for two hours while a minor inmate lay unconscious and vomiting); *Harris v. Hegmann*, 198 F.3d 153, 159–60 (5th Cir. 1999) (holding that a prisoner adequately stated a claim for deliberate indifference where he alleged that prison medical personnel failed to properly set his broken jaw and ignored his complaints of excruciating pain).

Though there is some disagreement as to the appropriate standard to apply in the case of a mental patient as opposed to a prisoner, *Hare*, 74 F.3d at 647, the Supreme Court has

held that involuntarily committed mental patients have at least as many rights while in custody as prisoners have. *Youngberg*, 457 U.S. at 315–16 ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed – who may not be punished at all – in unsafe conditions.").

Defendants cite several cases, including *Peete*, for the proposition that medical personnel do not violate a patient's constitutional rights in the context of providing treatment. 486 F.3d at 222. These cases are distinguishable for the reasons discussed in Section IV.B. Defendants also contend that Plaintiff has failed to point to a case in which a court has found a state actor liable under the same or similar circumstances. But Defendants' interpretation is overly narrow. A plaintiff does not need to show that a court has found a violation in identical circumstances; rather, the plaintiff need only show that the state actor has "fair warning" that his conduct violates the constitution. *Hope*, 536 U.S. at 741; *see also Austin*, 328 F.3d at 210. Based on the Supreme Court's holding in *Youngberg*, state-employed medical officials were on notice that deliberate indifference to the medical needs of an involuntarily committed patient violated that patient's constitutional rights.

Taking the evidence in the light most favorable to Plaintiff, the Court finds that a reasonable person would have understood Cornell to be restrained in the hospital involuntarily and against his will, thus creating a special relationship between Cornell and Defendants. Cornell arrived at the hospital handcuffed and in the custody of the police. Though he initially cooperated during intake procedures, he attempted to leave at various

points during the night only to be forcibly restrained and prevented from leaving by hospital personnel.[6]  Even if hospital personnel believed they acted in his best interest, this inquiry affects the adequacy of their medical care, *not* whether they had a special relationship with Cornell.  As a result of being restrained, Cornell could not, of his own volition, seek alternative medical care for his heart condition; he was entirely at the whim of the Psych ER staff.  Thus, under *DeShaney*, Defendants had a duty not to withhold appropriate medical care.  The Court finds that, under these circumstances, a reasonable doctor, nurse, or technician would have understood that they had custody over Cornell and thus had an affirmative duty to ensure that he received adequate medical care.[7]

---

[6]As discussed in this Court's June 26, 2013 Order, this fact distinguishes this case from *Crofts v. Dallas County Hospital District*, 1998 WL 75899 (N.D. Tex. 1998), *aff'd* 192 F.3d 125 (5th Cir. 1999).  There, a patient was brought to the hospital by police and placed in a second-story room.  *Id.* at *1.  The patient jumped out of the window and ultimately died of the injuries.  *Id.*  The court found there was no special relationship because the patient was there voluntarily and there was no evidence showing that Crofts was not free to leave.  *Id.* at *3–4.  Here, Cornell was affirmatively restrained and physically prevented from leaving the hospital.  Thus, unlike the patients in the other cases, he was involuntarily held.

[7]Plaintiff argues, in the alternative, that Defendants violated Cornell's statutory rights to medical care by failing to comply with the requirements of the Emergency Medical Treatment and Active Labor Act ("EMTALA").  42 U.S.C. § 1395dd.  Many circuits have found that EMTALA allows claims against participating hospitals but does not provide a private right of action against individuals.  *See Moses v. Providence Hosp. and Med. Ctrs., Inc.*, 561 F.3d 573, 587 (6th Cir. 2009) (collecting cases); *Liles v. TH Healthcare, Ltd.*, 2012 WL 3930616, at *8 (E.D. Tex. 2012); *Dysart v. Selvaggi*, 159 F. Supp. 2d 387, 390 (N.D. Tex. 2001).  Thus, Plaintiff does not have a statutory claim against Defendants based on EMTALA.

### D.  Failure to Supervise and Train

Finally, Plaintiff seeks to hold Shierding, Nurse Brown, and Dr. Anderson liable for failing to adequately supervise Parkland and its employees.  At the time of the incident, it was clearly established in the Fifth Circuit that a "supervisory official may be held liable under section 1983 for the wrongful acts of a subordinate 'when [the supervisory official] breaches a duty imposed by state or local law, and this breach causes plaintiff's constitutional injury.' " *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998) (quoting *Sims v. Adams*, 537 F.2d 829, 831 (5th Cir. 1976)); *see also Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 455 (5th Cir. 1994) (en banc).  The Fifth Circuit has emphasized that while supervisory officials cannot be liable for the acts of their subordinates under a theory of vicarious liability or *respondeat superior*, they can be held liable when they exhibit deliberate indifference.  *Estate of Davis*, 406 F.3d at 381.  Deliberate indifference exists when plaintiff can show a " 'pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation.' " *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003)).

Defendants argue that the Supreme Court's decision in *Ashcroft v. Iqbal*[8] narrowed, if not abolished, this type of supervisory liability claim.  *See* Shierding, Brown, Anderson Reply 9 [154].  The Court previously addressed this argument in its Order denying the motions to dismiss.  *See* Order June 26, 2013 at 20–21 n.13.  The Fifth Circuit has not held

---

[8]556 U.S. 662 (2009).

that *Iqbal* changes prior cases law regarding the availability of supervisory liability. Thus, supervisory officials in the Fifth Circuit have fair warning that demonstrating deliberate indifference in failing to supervise or train their subordinates is unconstitutional. The Court therefore finds this right clearly established within the Fifth Circuit.

## V. QUESTIONS OF FACT PRECLUDE SUMMARY JUDGMENT

The Court next considers whether the facts, when taken in the light most favorable to the Plaintiff, demonstrate the occurrence of a constitutional violation. *Saucier*, 533 U.S. at 201.

### A. Excessive Force

Plaintiff first contends that technicians Roberts, Achebe, and Givens used excessive force against Cornell by taking him to the ground and holding him in the prone (or face-down) position on his stomach for extended periods of time. The right to be free of excessive force arises under the Fourth Amendment protection against unreasonable seizures. *Tolan*, 134 S. Ct. at 1865 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)). To succeed on an excessive force claim, a plaintiff must show that (1) he suffered an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable. *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000)). To evaluate the constitutionality of a use of force, courts " 'balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the government's interests alleged to justify the intrusion.' " *Id.* (quoting *United States v. Place*,

462 U.S. 696, 703 (1983)). "This balancing test 'requires careful attention to the facts and circumstances of each particular case.' " *Flores v. City of Palacios*, 381 F.3d 391, 398–99 (5th Cir. 2004) (quoting *Graham*, 490 U.S. at 396).

Plaintiff contends that Cornell died as a result of being held face-down on the ground for extended periods of time. There are issues of fact as to the position and length of time Cornell was held. Plaintiff presents evidence that Cornell was held in a prone position on two occasions, once for five to ten minutes and again for ten to fifteen minutes. Plaintiff also presents evidence that Parkland's policies prohibit or limit these types of restraints because they can cause asphyxiation and death. Plaintiff further shows that Roberts, Achebe, and Givens were instructed during training not to hold patients in these positions. All three technicians acknowledged in their depositions that holding a patient in this position would be dangerous and would violate their training. Further, Plaintiff has shown that alternative methods of subduing Cornell were available. Thus, the use of such force would not be objectively reasonable. Finally, the medical examiner's report indicates that asphyxiation is one possible cause of Cornell's death. Taking these facts in the light most favorable to Plaintiff, the Court finds Plaintiff has sufficiently raised a fact issue regarding whether Achebe, Roberts, and Givens used excessive force against Cornell.

### B. Denial of Medical Care

Courts applying the "special relationship" exception to the *DeShaney* rule "have generally required plaintiffs to demonstrate . . . that the defendant state official at a minimum acted with deliberate indifference toward the plaintiff." *McClendon v. City of Columbia*, 305

F.3d 314, 326 (5th Cir. 2002).[9]  To succeed on a deliberate indifference to medical care claim, a plaintiff must show that a state actor knew of and disregarded an excessive risk to the victim's health or safety.  *McClendon*, 305 F.3d at 326 n.8.  "The state actor's actual knowledge [of a serious medical need] is critical to the inquiry."  *Id.*  A serious medical need is "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required."  *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006).  A state actor's failure to alleviate a significant risk that he should have known about but did not does not constitute deliberate indifference.  *McClendon*, 305 F.3d at 386 n.8.

---

[9]In *Hare v. City of Corinth*, the Fifth Circuit considered whether *DeShaney* overruled *Youngberg* with respect to the appropriate standard to apply in special relationship cases.  74 F.3d 633, 646–48 (5th Cir. 1996).  The Fifth Circuit noted that in *Youngberg*, which involved a mental patient involuntarily committed to a state mental institution, the Supreme Court held that " 'liability may be imposed only when the decision by the [mental health] professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person actually did not base the decision on such a judgment.' "  *Id.* at 646 (alteration in original) (quoting *Youngberg*, 457 U.S. at 323).  *DeShaney* suggested, however, that the deliberate indifference standard should apply in all cases.  *Id.* at 647.  Though the Fifth Circuit explicitly did not decide whether *DeShaney* overruled *Youngberg*, the Court need not resolve the dispute to evaluate Cornell's claim.  It follows from other Supreme Court cases that a civilly committed individual should be entitled to more rights than those criminally committed.  *Dolihite v. Maughon By and Through Videon*, 74 F.3d 1027, 1041 (11th Cir. 1996) (citing *Romeo*, 457 U.S. 307, 322 (1982)).  Thus, "actions of a mental health professional which would violate a prisoner's Eighth Amendment rights would also violate the due process rights of the involuntarily civilly committed."  *Id.*  A state official "violates a prisoner's Eighth Amendment rights when the official is deliberately indifferent to the prisoner's serious medical needs."  *Id.* (citing *Estelle*, 429 U.S. 97).  Because a doctor who violates the deliberate indifference standard would thus also violate a civilly committed patient's rights under *Youngberg*, the Court evaluates Plaintiff's claim using a deliberate indifference standard.

As discussed with respect to the first prong, Plaintiff has raised issues of fact as to whether Cornell was involuntarily held. At this stage, drawing all reasonable inferences in favor of the Plaintiff, the Court concludes that Plaintiff has shown sufficient evidence for the Court to find that Cornell was involuntarily committed to the Parkland Psych ER and thus had a special relationship with Defendants. *See supra* Section IV.C.

The Court next examines whether Plaintiff has shown that Defendants exhibited deliberate indifference to a serious medical condition. Plaintiff raises issues of fact as to whether the medical staff knew that Cornell suffered from a heart condition but nevertheless failed to provide adequate medical care related to that condition. Plaintiff has shown that Cornell informed doctors during the intake procedure that he suffered from a heart condition. Plaintiff has also shown that Cornell's vital signs, including his pulse and blood pressure, were abnormal when measured, though the technician was not able to confirm the elevated rates. Thus, a reasonable jury could find that Cornell's heart condition was so apparent that a layman would have recognized it. Further, Plaintiff has shown evidence that not only did the hospital staff fail to treat Cornell for any heart condition, they also administered medication contraindicated for certain heart conditions, held him in a dangerous position, and failed to monitor him. The Court finds that these questions of fact preclude summary judgment at this stage.

### C. Failure to Supervise and Train

To hold a supervisory official liable for failure to supervise and train, the plaintiff must show that "(1) the supervisor either failed to supervise or train the subordinate official;

(2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Brenoettsy*, 158 F.3d at 911–12. "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 912. The plaintiff "usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation." *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003).

Plaintiff has shown evidence of a longstanding pattern of violations at Parkland that directly relate to the type of care Cornell received. Plaintiff has submitted evidence showing that Shierding and Nurse Brown were aware of prior occasions when patients complained of excessive force. Further, Plaintiff has shown that Shierding and Nurse Brown failed to ensure that DeGuzman, who was under their supervision, was properly trained and certified in restraint techniques. Plaintiff has also demonstrated that Dr. Anderson received reports of Parkland's deficiencies years before Cornell's death but failed to remedy them. The Court finds there is an issue of fact as to whether the supervisory Defendants acted with deliberate indifference and thus denies qualified immunity as to this claim.

## CONCLUSION

For the foregoing reasons, the Court concludes that none of the remaining Defendants is entitled to qualified immunity. The Court therefore denies the motions for summary judgment.

Signed September 9, 2014.

David C. Godbey
United States District Judge